CLEVELAND POLICE PATROLMEN'S ASSOCIATION ET AL., APPELLANTS, *v.* VOINOVICH, MAYOR, ET AL., APPELLEES.

(No. 48205—Decided March 26, 1984.)

*Messrs. Chattman, Garfield, Friedlander & Paul* and *Mr. Gerald B. Chattman,* for appellants.

*Mr. John D. Maddox,* director of law, and *Mr. Anthony J. Garofoli,* for appellees.

DAY, C.J.   Plaintiffs-appellants, Cleveland Police Patrolmen's Association and Paul Jurcisin (plaintiffs), appeal the judgment of the common pleas court denying plaintiffs' request for temporary and permanent injunctive relief against layoff action by defendants-appellees, George V. Voinovich et al. (defendants). For reasons adduced below the errors assigned are not well-taken. The judgment of the trial court is affirmed.

I

On February 13, 1984, plaintiffs filed a motion for a temporary restraining order and a complaint for a permanent injunction to prevent a police layoff scheduled for February 24, 1984. The complaint and motion were consolidated for trial. A motion to intervene filed by the Fraternal Order of Police, a labor union representing supervisory level police officers, was granted. Trial was had on February 15 and 16.

II

It is conceded that R.C. Chapter 5705[1] of the Revised Code mandates that the city of Cleveland (the city) operate on a balanced budget. Faced with the expectation that the 1984 general fund for the city would not be sufficient to pay the costs of services, Mayor George V. Voinovich, the chief executive officer of the city, issued layoff notices to five hundred ninety-seven city employees. The notices were to take effect on February 24, 1984.

Five hundred and ninety-seven employees were to be laid off, two hundred ninety of them are police patrol officers. The city's total police force was approximately one thousand eight hundred fifteen officers. According to Chief of Police William J. Hanton, one hundred of the two hundred ninety patrol positions vacated would be filled by officers from other support units.[2] Mr. Phillip Allen, executive assistant to the mayor, testified that due to attrition there would also "be an additional 104 police leaving the force during this fiscal year" for a total of three hundred ninety-four.

Based on the layoffs, the scheduled current number of zone patrol cars each twenty-four hour shift would be reduced from one hundred sixty to one hundred ten. The chief of police testified that in his opinion the one hundred ten "car level" would provide "basic service" but "probably a level that will not be satisfactory to the citizens of the community."

The city's plan before February 24, 1984, placed one hundred seventy-four cars on the street for every twenty-four hour period. Because of breakdowns and manpower shortages, the average has been approximately up to one hundred sixty cars per twenty-four hour period. Under cross-examination, the chief of police acknowledged that under the proposed one hundred ten car plan it would be possible for the number of cars on the streets to "drop into the range of 89 or 90."

Cleveland public safety director, Mr. Reginald Turner, indicated that the one hundred ten car plan would be satisfactory and would provide a "safe level of service * * *."

The mayor, based upon the input from the public safety director and the chief of police, was satisfied with the one hundred ten car plan.

---

[1] No one specific section of the chapter compels the balanced budget. The accumulative effect of several sections achieves that result.

[2] Such support units include: mounted police, traffic enforcement, detective, narcotics, homicide, auto theft, and juvenile.

Plaintiffs' evidence was that according to the Uniform Crime Report covering the year 1982 for cities in the east-north central region with populations over two hundred fifty thousand, the average of police officers per one thousand population was 3.4. Testimony placed Cleveland in the region and indicated further that if the Cleveland police force were reduced by two hundred ninety, the average would fall to 2.65. If another one hundred were lost, the average would drop to 2.48.

The trial court found that the comparison of these averages had little probative value because there was no proof adduced at trial:

"A. that the cities considered in the national study had the same cultural, ethnic and racial composition as the City of Cleveland;

"B. that they had the same degree of unemployment, poverty and economic deprivation;

"C. that they had the same percentage of criminality; and

"D. that the other cities were limited by the same amount of operating funds available for the employment of police personnel."

A notice of decision denying temporary and injunctive relief was journalized on February 21, 1984. A judgment entry followed on February 23, 1984. In effect, the entry declared the rights and status of the parties and formalized the denial of the plaintiffs' request for temporary and permanent injunctive relief.

On February 21, 1984, plaintiffs lodged an appeal in the Eighth Appellate District and moved for an injunction pending disposition of the matters on review. The motion was denied on February 23, 1984. Accelerated process was instituted and the merits were argued March 8, 1984.

### III

Assignment of Error No. I:

"The trial court erred in holding that the doctrine of Separation of Powers prohibits the courts from enjoining the layoff of police officers by the executive and legislative branches of city government absent a finding of 'gross abuse of discretion'."

The doctrine of separation of powers is fundamental to both the federal and state of Ohio constitutional systems. The doctrine does not mean that there is an hermetic seal between executive, legislative, and judicial functions. There is interaction to conform to constitutional requirements. But, under the Ohio Constitution, it is only in the rarest of circumstances that the judiciary may intervene to substitute its judgment for one made by the executive in discharge of its powers.

In applying these principles to municipal government the Supreme Court of Ohio has made it quite plain that the layoff of police officers due to a city's "exigent financial circumstances" does not necessarily constitute a gross abuse of discretion even though layoffs may have an adverse effect on the police department's ability to serve the public. *McNea* v. *Voinovich* (1982), 70 Ohio St. 2d 117, 121 [24 O.O.3d 193]. There is an intimation in *McNea* that were the number of layoffs so high as to result in " 'functional paralysis' " a case for gross abuse might be made. For then the circumstances would be such as to raise a substantial question whether the layoff of safety personnel jeopardized the community's "health, safety, morals and welfare." However, routine findings of jeopardy in such situations were disapproved. *Id.*

Assignment of Error No. I is without merit.

### IV

Assignment of Error No. II:

"The trial court erred in holding that the proposed plan of Mayor George V. Voinovich to reduce the Cleveland Police Department by 394 officers was not so excessive as to unlawfully jeopar-

dize the health, safety, morals and public welfare of the inhabitants of the City of Cleveland."

This assignment at bottom is an attack upon the trial court's evaluation of the evidence. The weight of the evidence and the credibility of witnesses is primarily a function for the trier of the facts. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, 231 [39 O.O.2d 366]. Thus, in reviewing a bench trial, an appellate court will uphold the trial court's evaluations unless it appears that the record is insufficient to support a reasonable person in concluding as the trial judge did.

In the present case the chief of police testified that even after the contemplated reduction in force, the police department would still be able to provide basic services. And the judgment of the public safety director supported the conclusion of the chief. In the director's judgment the new plan would provide a "safe level of service."

With the evidence in this stance, it cannot be said that the trial court's jeopardy conclusions were such that no reasonable person could have concluded as he did.

Assignment of Error No. II is not well-taken.

## V

Assignment of Error No. III:
"The trial court erred in holding that the City Administration acted in good faith, honestly and judiciously in the lawful exercise of their authority in formulating the plan to reduce the Cleveland Police Department by 394 officers."

When Assignment of Error No. III is read in the context of the section of the plaintiffs' appellate brief in support of the assignment, it is apparent that the plaintiffs' attack is essentially a challenge to the administration's layoff action as a gross abuse of discretion. For purposes of the challenge the plaintiffs adopt the definition of abuse of discretion in *Neiswender* v. *Edinger* (1978), 59

Ohio App. 2d 25, 29 [13 O.O.3d 96], which in turn adopts a statement taken from Ohio Jurisprudence:

" 'Discretion may be said to be abused where the action complained of has been arbitrary or capricious or based on personal, selfish, or fraudulent motives, or on false information, or has been taken under total lack of authority to act, where it amounts to evasion of a positive duty, * * *.

" 'The term "abuse of discretion" connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary, or unconscionable attitude. * * *' "

That same quotation goes on to say:
" 'An act which is in accordance with the law cannot be deemed an abuse of discretion. * * *' "

From this one can conclude (not without some circuity of reasoning) that if the pejoratives in the definition can be demonstrated then an abuse of discretion exists in violation of law.

Plaintiffs argue various propositions to support the conclusion that discretion has been abused. These include the sheer number of layoffs plus the manpower losses due to attrition; the slide in manning of the Cleveland police force over a period of years but especially since 1981; the city's primary concern with dollars rather than safety; its coming to judgment on the layoff issue without consultation with the patrolmen's union and no consideration of the statistics which show that Cleveland has fewer officers per thousand of population than other cities in northeastern United States of comparable size.

These arguments have little relevance to the issue of the city's good faith in acting as it did. For the arguments attack the city's judgment and its processes to judgment rather than its integrity. Another claim (that may have some nexus with good faith) is that the chief executive exaggerated his intentions with regard to safety force layoffs

during the campaign to persuade the citizens of Cleveland to vote for an income tax increase. Having failed to secure the tax increase, plaintiffs argue, he felt "compelled to go through with massive layoff of police officers in the face of the evidence of their serious effect upon the health, safety, morals and welfare of the community in order to demonstrate his 'credibility,' * * *."

Whatever may be said for standards of verity during political controversies, political puffery is known widely enough to be judicially noticed. It is equally well known that it sometimes outruns the facts without overstepping the line that divides "hype" from accepted standards of fraud. Moreover, in this case there is no question that there is indeed a fiscal crisis. Neither is there any question that the crisis existed at the time the municipal chief executive and his aides undertook to do those things which they deemed necessary to meet their obligations to balance the budget under R.C. Chapter 5705.[3] Thus, there is no substantial evidence of a connection between the current layoffs and a deliberate effort on the part of the mayor to fulfill his own prophecy. On the contrary, there is sufficient evidence of a real fiscal crisis in Cleveland to lend credence to the belief that the mayor was responding to it. On this record it cannot be said that the trial court erred in finding as it did with respect to the mayor's action in the exercise of his authority to reduce the safety forces.

Assignment of Error No. III is without merit.

## VI

Assignment of Error No. IV:

"The trial court erred in holding that police officers do not have a right to be protected against the adverse effects of the proposed layoff or to be provided with a place of employment that is reasonably safe and free from undue risk of harm."

The plaintiffs' argument under Assignment of Error No. IV is certainly ingenious (and it may be ingenuous as well) given the fact that the trial court said in its judgment entry, paragraph 8:

"The patrol officers remaining after the lay off has been implemented do not have a constitutional or statutory right to be protected against the adverse effects of the plan to lay off 290 patrol officers or to be provided with both employment and a place of employment, i.e. police districts, that are reasonably safe and free of undue risk of harm."

It may be assumed that the layoff will have some effects which might be termed "adverse." It is reasonable to assume that a layoff of this proportion will dilute to some degree the community advantages which an effective operating police force provides. It is also true that persons laid off will suffer some adverse effects. All must be endured by those upon whom they fall so long as the city acts within the limits which the Supreme Court of Ohio has ordained. Having said this it was unnecessary to go further and say that the city has no obligation to provide places of work that are reasonably safe and free of undue risk of harm. Despite the language in paragraph 8 of the lower court's judgment, it seems likely that the lower court did not mean the full implication of a literal reading of its order. But if it did, the lower court was correct for a different reason.

Whether or not the safe place to work statutes (R.C. 4101.01[K]; 4101.11 and 4101.12) apply to municipalities,[4] it seems a self-proving proposition that the city could not deliberately provide places and equipment for police work that were not reasonably safe and free

---

[3] See fn. 1, *supra*.

[4] The statute seems broad enough to cover every employer, see R.C. 4101.01(K).

of undue risk of harm.[5] For example, inoperable revolvers or faulty police cars and radio equipment would be unconscionable. However, that does not mean that all danger can be taken out of law enforcement. In the nature of the case what is reasonably safe and free of undue risk of harm will be different for police forces than it will for more sedentary and less adventurous occupations. And while massive reductions in the forces may bring the safety of police officers to a point where risk may become intolerable, the record in this case does not demonstrate that the point has been reached. It is a matter of proof which has not been made.

Assignment of Error No. IV is without merit.

### VII

The judgment is affirmed.

*Judgment affirmed.*

JACKSON and NAHRA, JJ., concur.

---

[5] And it seems obvious, the trial court did not mean to say or hold to the contrary.